# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

ROBERT HOLMES, *et al.*,

    Plaintiffs,

    v.

YCT. NOVA, *et al.*,

    Defendants.

Case No. C16-1422RSL

MEMORANDUM OF DECISION

This matter was heard by the Court in a two day bench trial commencing on May 14, 2018. Plaintiff Marquis International Holdings, LLC, ("MIH") filed this lawsuit to obtain a declaration that it owns the vessel M SQUARED free and clear of any maritime lien asserted by defendant S.B. Joseph Clark.[1] Clark opposed MIH's efforts to invalidate the lien, asserted an unjust enrichment counterclaim, and raised laches and account stated as affirmative defenses.

## FINDINGS OF FACT

By a preponderance of the evidence, the Court finds as follows:

MIH is and, at all relevant times, has been the legal title holder and documented

---

[1] There was another vessel, two additional defendants, and a number of claims involved in this lawsuit when MIH and its principal, Robert Holmes, filed the complaint in September 2016. With one exception, discussed in the text, all of the other claims were resolved when the vessels were turned over to MIH and Holmes and/or when those parties settled with the shipyard and its owner.

MEMORANDUM OF DECISION - 1

owner of the vessel M SQUARED. Robert and Lynette Holmes are the owners and sole members of MIH. Not long after the M SQUARED was brought to the Pacific Northwest and entrusted to Stephen Yadvish and his boatyard/brokerage, Yachtfish Marine, Inc. ("YMI"), disputes broke out regarding the type of work that was being done, the number of hours billed, the hourly rates charged, and the accuracy of the billing. When Holmes threatened to remove the vessel from the boatyard, Yadvish claimed some sort of partnership interest and threatened to file a maritime lien against the vessel.

In October 2014, MIH and YMI settled the outstanding invoices, and Holmes instructed Yadvish to stop all work on the M SQUARED.[2] By that time, MIH and/or Holmes had invested $220,196.50 in the purchase and transport of the M SQUARED and $286,845.06 for repairs. The shipyard continued to send invoices until February 2015, but MIH suspected that some or all of the work stated on the invoices was not actually being done or, if it were, it was the low-priced cosmetic work that Yadvish could bill at a large markup. To the extent that any work was actually being performed, it was not authorized, and Holmes had made clear that he would not pay any more invoices after October 2014. Holmes believed that Yadvish was simply angry that he disagreed with Yadvish's plan to completely refurbish the vessel, but that with no payments coming in, Yadvish would eventually heed the instruction to stop work, allowing the parties to negotiate the release of the vessel. Holmes received a final invoice in February 2015 and attempted to obtain an independent evaluation of the value of the work Yadvish had actually performed. Holmes reiterated his instruction to stop all work.

In April 2015, Yadvish sued MIH and Holmes in state court, claiming that the parties had a partnership or joint venture agreement regarding the repairs to the

---

[2] At trial, Yadvish testified that Holmes revoked the stop work instruction a couple weeks later. While the Court does not doubt that Yadvish is a talented and experienced craftsman who does excellent work, the Court found Yadvish's testimony generally incredible.

M SQUARED. Yadvish sought an order either disassociating Holmes from the joint venture or dissolving the joint venture and allowing Yadvish to wind up the repair activities and pay "[a]ll obligations of the joint venture to Mr. Yadvish, and/or to third parties who have loaned funds to Mr. Yadvish," ahead of and with priority over any payments to MIH or Holmes. Dkt. # 52-1 at 7-8.

Unbeknownst to Holmes, Yadvish had approached Clark in January 2015 about purchasing the M SQUARED. Clark was not interested, but after hearing Yadvish's story of a partner who had disappeared mid-project and had left Yadvish with unpaid bills and insufficient funds to complete the repairs, Clark was willing to provide assistance. Based in large part on his attorney's assurance that any amounts Clark advanced for the repair of the M SQUARED would be secured through a maritime lien and/or collateral, Clark loaned Yadvish $673,632.93 to complete the repairs, sell the vessel, and pay everyone back.[3] Clark was aware that MIH and/or Holmes owned the boat and had hundreds of thousands of dollars in the project already, but made no attempt to contact Holmes or otherwise verify Yadvish's claim of lawful control over the vessel. Clark relied on his attorney[4] to negotiate the details of the loan to Yadvish, to reduce the agreement to writing, and to ensure that his interests were secured.

During the pendency of the state court proceeding, MIH sent a marine surveyor to evaluate the M SQUARED. When it became clear that work was still being performed, MIH again instructed YMI to cease all work on the vessel. Yadvish responded that the request to stop work was unreasonable. It was only thereafter, at the end of September 2015, that Holmes learned that Yadvish had found an investor, Clark, who believed he had a maritime lien on the vessel in excess of half a million dollars. Holmes and MIH

---

[3] Most of that money was spent by September 2015.

[4] Clark and Yadvish were apparently represented by the same attorney, R. Bruce Johnston, as they negotiated the financing/loan agreement.

MEMORANDUM OF DECISION - 3

ultimately obtained a declaration that there was no partnership with Yadvish and the return of the vessel in the state court proceeding. MIH filed this action to clear the maritime lien Clark had asserted against the M SQUARED.

**CONCLUSIONS OF LAW**

Based on the foregoing facts - and notwithstanding his attorney's assurance to the contrary - Clark does not have a maritime lien against the M SQUARED. The person claiming a maritime lien has the burden of establishing that goods or services were provided to the vessel on the order of the owner or a person authorized by the owner. ING Bank N.V. v. Temara, 203 F. Supp.3d 355, 363 (S.D.N.Y. 2016). Although there are certain categories of persons who are presumed to have authority to procure necessaries for a vessel,[5] a shipyard or general repair contractor is not one of them. Such a person is hired to provide repair or maintenance services and is not entrusted with "management" of the vessel for purposes of 46 U.S.C. § 31341(a)(3). See Farwest Steel Corp. v. Barge Sea-Span 241, 828 F.2d 522, 525-26 (9th Cir. 1987).

Nor has Clark shown that Yadvish was acting as MIH's agent when he solicited funds from Clark. There is no credible evidence that Yadvish was authorized to do anything with regards to the M SQUARED after October 2014, much less that he was authorized to borrow funds against the vessel. To the extent Clark is arguing that Yadvish had apparent authority to procure necessaries for the vessel, the argument also fails. As far as Clark knew, Yadvish had some sort of profit-sharing arrangement with the owner of the vessel, but the owner had disappeared and refused to respond to Yadvish's communications, leaving Yadvish with unpaid bills. Clark was aware that Yadvish did not own the vessel. Clark had no direct contractual relationship with the owner and had

---

[5] Of relevance here, "a person entrusted with the management of the vessel at the port of supply" and an "agent appointed by . . . the owner" are persons "presumed to have authority to procure necessaries for a vessel." 46 U.S.C. § 31341(a).

MEMORANDUM OF DECISION - 4

no contact with the owner. There is no evidence that the delinquent owner took any action or made any representation that would have led Clark to believe that Yadvish was authorized to complete repairs of the vessel, much less to acquire third-party investments to do so. Salyers v. Metro. Life Ins. Co., 871 F.3d 934, 940 (9th Cir. 2017) (apparent authority arises "when the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he purported to have."). No reasonable inference of authority or agency (actual or apparent) arises from the facts of this case.

Even if there were some interpretation of the facts that could give rise to a reasonable inference that MIH authorized or consented to borrowing funds against the vessel to complete the repairs (which the Court finds there was not), subsection (b) of 46 U.S.C. § 31341 specifically excludes from the list of persons with authority to procure necessaries for a vessel any person who is "tortiously or unlawfully in possession or charge of" the vessel. Once MIH issued the stop work order and demanded return of the vessel, Yadvish's continued possession was tortious and unlawful.[6] He therefore had no authority to procure necessaries for the M SQUARED or to subject her to a supplier's lien.

The doctrine of laches does not give rise to a maritime lien in the circumstances presented here or otherwise prohibit MIH from contesting the existence of a maritime lien. Laches is an equitable defense that prevents a party who, "with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." Danjaq LLC v. Sony Corp., 263 F.3d 942, 950-51 (9th Cir. 2001). To establish laches, Clark must show that Holmes and/or MIH inexcusably delayed asserting a known right and that Clark was prejudiced

---

[6] Clark's alternative claim that he is subrogated to YMI's maritime lien fails for the same reason: Holmes withdrew any authorization to continue working on the M SQUARED in October 2014 after having settled all outstanding invoices with Yadvish. YMI had no valid claim to a maritime lien that could be transferred to Clark.

MEMORANDUM OF DECISION - 5

thereby. O'Donnell v. Vencor Inc., 466 F.3d 1104, 1112 (9th Cir. 2006). When Holmes realized that Yadvish was not following his repair instructions, he settled all outstanding invoices and instructed Yadvish to stop work on the M SQUARED. Yadvish refused to return the vessel to its rightful owner, however, and indicated an intent to continue work on the vessel. Holmes periodically reiterated that no work was authorized and that he would not pay for any work that was done. He did not pay any invoices after October 2014. Yadvish's decision to ignore the instructions and incur additional repair expenses was not based on any reasonable belief that Holmes had authorized the expenditures or had *sub silentio* rescinded the stop work orders. The unauthorized expenditures do not give him – or Clark as his subrogee – any right in equity for relief. With regards to Clark himself, Holmes first became aware of Clark's investment in the M SQUARED at the end of September 2015. Holmes filed a motion for return of the vessel in December 2015. The delay of a little over two months while Holmes located Clark, ascertained his interests, and communicated his opposition to any work on the M SQUARED was not unreasonable. Clark's losses, most of which had already been incurred by September 2015, were the result of Yadvish's knowing disregard of the owner's instructions and Clark's improvident loan to Yadvish on the mistaken advice of counsel, not any lack of diligence or delay on Holmes' part.

Clark alternatively argues that, even if there is no maritime lien against the M SQUARED, MIH was unjustly enriched by his efforts and he is entitled to recover the $673,632.93 he contributed towards the repair of the vessel. "Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." Young v. Young, 164 Wn.2d 477, 484 (2008). A person can be enriched without incurring liability: unjust enrichment occurs only where something of value has been placed in a party's possession which, in equity and good conscience, should not be retained. Lynch v. Deaconess Med.

Ctr., 113 Wn.2d 162, 165-66 (1989). To succeed on his claim of unjust enrichment, Clark must show that he conferred a benefit on MIH and that MIH knew of and retained the benefit under inequitable circumstances. If Clark were a volunteer, there would be nothing inequitable about accepting the benefits voluntarily provided. Id. at 165.

Neither MIH nor Holmes requested Clark's assistance in repairing the M SQUARED, and they were unaware of his involvement until September 2015, by which time, according to Clark's attorney, all but a few thousand dollars of Clark's money had already been spent. As between the parties to the counterclaim, Clark was a volunteer. Nor did the owners encourage, authorize, or acquiesce in the post-October 2014 repairs that YMI performed using Clark's money. Holmes' plan was to get the vessel's systems in working order and conduct a sea trial to see if the vessel could still achieve the speeds one would expect from this type of craft. Only then could he calculate the vessel's potential resale value and know how much of an investment to make. Clark's loan derailed this plan by funding Yadvish's unauthorized and unwanted cosmetic refurbishment of the vessel. The record does not support a reasonable inference that, whatever benefit MIH may have actually received from Clark's loans to Yadvish and/or YMI (which would certainly not be the entire $673,632.93 he contributed to the project), it would be unjust or inequitable for MIH to retain it without payment. In addition, Clark has adequate legal remedies against YMI, Yadvish, and/or his former attorney for recovery of the amounts loaned to YMI and/or Yadvish, making recourse to equity unwarranted.

Clark has not provided any legal analysis in support of his claim for recovery under the doctrine of account stated. An "account stated" is an agreement, express or implied from a prior course of dealing between the parties, that all items of the account stated on an invoice are true and that the debtor will pay the balance. An agreement to pay can be implied from the circumstances, but it is an essential element of an account stated

MEMORANDUM OF DECISION - 7

defense. In this case, the purported liability shown on the invoices Yadvish sent to Holmes between October 2014 and February 2015 had been repudiated prior to any debt being incurred. There was no agreement, express or implied, to pay for any additional work. In such circumstances, the failure of a person to object to the correctness of each new statement of account does not imply a promise to pay or convert the contested debt into an account stated.

Clark financed Yadvish's activities related to the M SQUARED and believed that his contribution would be repaid with interest in the form of a share in the profits once the vessel was sold and that he was protected by a maritime lien. He was not Yadvish's partner. Although Clark's loan may have enabled Yadvish's tortious and unlawful retention of the vessel, Clark cannot be held legally responsible for Yadvish's actions on a partnership theory.

In a case declaring the validity or invalidity of a maritime lien, "[t]he court may award costs and attorneys fees to the prevailing party, unless the court finds that the position of the other party was substantially justified or other circumstances make an award of costs and attorneys fees unjust." 46 U.S.C. § 31343(c)(2). In the remarkable circumstances of this case, an award of costs and attorneys fees would be unjust. At the end, this litigation pitted two men, both of whom were only passingly familiar with the details and oddities of maritime law, who mistakenly viewed their investments in the M SQUARED as just another business deal. They both, in varying ways, relied not only on Yadvish's expertise as a craftsman, but also on his claims of authority, his recitation of key facts, and his assertions regarding maritime rights. Clark had a good faith, but mistaken, belief that his loan was secured by a lien on the M SQUARED, and the circumstances would make an award of fees unjust.

//

For all of the foregoing reasons, the Court hereby declares that MIH owns the vessel M SQUARED free and clear of any maritime lien asserted by Clark. Clark is not entitled to equitable relief against Holmes or MIH, and he has not proved his account stated defense. The Clerk of Court is directed to enter judgment in favor of plaintiffs and against defendant. Each side will bear its own costs and fees.

Dated this 6th day of June, 2018.

*Robert S. Lasnik*
Robert S. Lasnik
United States District Judge